J-S65006-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.N.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.L.W., NATURAL FATHER | : : : : : : | |
| | : | No. 316 MDA 2018 |

Appeal from the Decree January 11, 2018
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-8511

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.W., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.L.W., NATURAL FATHER | : : : : : | |
| | : | No. 317 MDA 2018 |

Appeal from the Decree January 11, 2018
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-8512

BEFORE:  SHOGAN, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED NOVEMBER 21, 2018**

D.M.L.W. ("Father") appeals the decrees[1] terminating his parental rights

to his minor daughters, D.N.W. (born in August of 2013) and N.M.W. (born in

---

[1]  By separate decrees, the trial court involuntarily terminated the parental rights of S.O. ("Mother") on January 11, 2018.  Mother filed separate appeals at 298 MDA 2018 and 299 MDA 2018.

July of 2014) (collectively, "the Children"), pursuant to 23 Pa.C.S. § 2511(a)(2) and (b). We affirm.[2]

The orphans' court fully set forth the facts of this case in its Pa.R.A.P. 1925(a) opinion, and we summarize the procedural background as follows: The record reveals that CYS assumed care of the Children on January 27, 2015, pursuant to a shelter care order. Reasons for the placement were the hospitalization of the natural parents, domestic violence, parental mental health and substance abuse issues, and unstable housing. Subsequently, the Children were placed in foster care on September 21, 2015. On November 28, 2016, Luzerne County Children and Youth Services ("CYS") filed a petition for the involuntary termination of Father's parental rights to the Children. The orphans' court conducted a termination hearing over several days, beginning on May 8, 2017, and ending on July 26, 2017.[3]

In support of its burden of proving by clear and convincing evidence that termination was warranted, CYS called the following witnesses: Irene Koehler, outpatient therapist for the ReDCO Group; Alicia Singer, senior clinician at Community Counseling Services; Grace Tavaris, case manager in

---

[2] We note with displeasure that neither CYS nor the Children's guardian *ad litem* has filed a responsive brief.

[3] The Children were represented by legal counsel and an attorney-guardian *ad litem* ("GAL"). Legal counsel was permitted to withdraw after the GAL advised the orphans' court that there was no conflict between the Children's legal and best interests and no party objected to counsel's withdrawal. N.T., 5/8/17, at 3.

- 2 -

the Intensive Family Reunification parenting program of Family Services Association; Marisue Sack, employed by Family Services Association in the Intensive Family Reunification parenting program; and Deborah Ficco, representative payee, of Fitzmaurice Community Services; and Sherri Hartman, caseworker for CYS. In response, Father testified on his own behalf.

On January 11, 2018, the orphans' court filed decrees terminating Father's parental rights to the Children. On February 12, 2018, Father filed timely notices of appeal.[4] Both Father and the trial court complied with Pa.R.A.P. 1925.

Father presents two questions for our consideration:

I.     Did the trial court abuse its discretion, commit an error of law and/or was there insufficient evidentiary support in terminating the parental rights of the natural father with respect to N.M.W. and D.N.W. pursuant to 23 PA. C.S.A. §2511(a)(2)?

II.    Did the trial court abuse its discretion, commit an error of law and/or was there insufficient evidentiary support in determining that the best interests of N.M.W. and D.N.W. would be served by terminating Father's parental rights?

Father's Brief at unnumbered 3 (full capitalization omitted).

We consider Father's issues according to the following standards:

_____

[4] Father had thirty days from January 11, 2018, to file his notices of appeal. Because the thirtieth day fell on Saturday, February 10, 2018, Father had until Monday, February 12, 2018, to appeal the termination decrees. *See* 1 Pa.C.S. 1908 (providing that when the last day of a calculated period of time falls on a Saturday or Sunday, such days shall be omitted from the computation). Father filed his appeal on February 12, 2018.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). Moreover:

there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re I.E.P.*, 87 A.3d 340, 343–344 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012)) (internal citations omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 25101–2938, governs termination of parental rights, and it requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court

- 4 -

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*) (explaining that the focus in terminating parental rights under Section 2511(a) is on the parent, but under Section 2511(b), the focus is on the child).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). The "standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). Moreover, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b). Orphans' Court Opinion, 3/12/18, at 2. Those subsections provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Regarding Section 2511(a)(2), this Court has stated as follows:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). Further, we have opined that "[t]he grounds for termination due to

- 6 -

parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *Id.* at 340. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.*

Pursuant to Section 2511(b), this Court must analyze whether termination is in the best interests of the Children. *In re L.M*., 923 A.2d at 511. "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re K.Z.S.*, 946 A.3d 753, 760 (Pa. Super. 2008). This Court will also look to the bond between the child and parent and determine the impact that termination of the parental relationship would have on the child. *Id.*

Additionally, "[t]he statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super.2001). We have recognized a connection between Pennsylvania's law on termination of parental rights and

the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 671 *et seq*.

The stated policy of AFSA is:

> to remove children from foster placement limbo where they know neither a committed parent nor can look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family.... States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in [AFSA]. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*In re B.L.L.*, 787 A.2d at 1016.

We have thoroughly reviewed the briefs of the parties, the relevant law, and the certified record before us, including the opinion of the orphans' court dated July 23, 2018, which addresses the issues raised by Father in his Pa.R.A.P. 1925(b) statement. Upon review, we determine that Father has failed to establish that the orphans' court abused its discretion when it involuntarily terminated Father's parental rights pursuant to Section 2511(a)(2) and (b). The orphans' court has provided a thorough evaluation supporting termination of Father's parental rights pursuant to those subsections. Thus, we conclude that Father's issues lack merit, and the

orphans' court's opinion adequately addresses Father's claims. Accordingly, we affirm on the basis of the orphans' court's opinion and adopt its reasoning as our own.[5]

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2018

---

[5] The parties are directed to attach a copy of the orphans' court's July 23, 2018 opinion to any future filings in this matter.

IN THE INTEREST OF : IN THE COURT OF COMMON PLEAS
D.W. : OF LUZERNE COUNTY
:
:
:
ORPHAN'S COURT DIVISION RECORDED
: 07/23/2018 2:50:09 PM
: JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
NO. A-8511 PENNSYLVANIA
: 316 MDA 2018 Inst Num: 201839288
:

IN THE INTEREST OF : IN THE COURT OF COMMON PLEAS
N.W. : OF LUZERNE COUNTY
:
:
:
ORPHAN'S COURT DIVISION RECORDED
: 07/23/2018 2:14:51 PM
: JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
NO. A-8512 PENNSYLVANIA
: 317 MDA 2018 Inst Num: 201839269
:

## SUPPLEMENTAL MEMORANDUM ISSUED
## PURSUANT TO PA.R.A.P. 1925(a)

### I. PROCEDURAL HISTORY

On November 28, 2016, Petitioner, Luzerne County Children and Youth Services (Children and Youth), filed a Petition for the Involuntary Termination of Parental Rights (Petition) of the natural parents for the minor children, D.W. and N.W., in addition to requesting a change of permanency goal to adoption. Several hearings were held commencing on May 8, 2017 and concluding on July 26, 2017. The court requested proposed findings of fact and conclusions of law from the parties, in addition to a recommendation from the guardian ad litem. The court received proposed findings of fact and conclusions of law, but did not receive a written recommendation from the guardian ad litem. The court took

the matter under advisement and on January 10, 2018, issued decrees terminating the parental rights of both natural father and natural mother.

The natural parents' parental rights were terminated pursuant to 23 Pa.C.S.A. §2511 (a)(2). In entering these termination decrees, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the children pursuant to 23 Pa.C.S.A. § 2511(b).

On February 9, 2018, Mother, by and through her Court-Appointed Counsel, filed a Notice of Appeal to the Superior Court and the requisite Statement of Matters Complained of on appeal. Mother's appeal was addressed by the Court with a Memorandum Pursuant to PA.R.A.P. 1925 (a) filed on March 12, 2018. Father, by and through his previous Court-Appointed Counsel, Keith Hunter, Esquire, filed a Notice of Fast Track Appeal on February 12, 2018, three days beyond the February 9, 2018 deadline for the filing of an appeal. Father's counsel did not file a Request to appeal Nunc Pro Tunc. The Trial Court stated in the memorandum pertaining to Mother's appeal that it would file a Supplemental Opinion pertaining to Father should the Superior Court entertain Father's untimely appeal. On July 12, 2018, the Superior Court entered an Order directing the trial court to file a supplemental opinion pertaining to Father's appeal within ten (10) days from the date of the order. This memorandum, therefore, addresses Father's appeal.

Father's Statement of Matters Complained of on Appeal filed by his previous counsel, Keith Hunter, Esquire, is as follows:

2

1.	The Trial Court erred in granting voluntary relinquishment of rights pursuant to the requirements of the Adoption Act of 1980, October 15, P.L. 934, No. 163 §1, et. seq.

2.	The Trial Court abused its discretion, committed an error of Law, and/or that there was insufficient evidentiary support for the Court's decision in accepting Appellant's voluntary relinquishment as knowingly, voluntarily, and willingly given.

3.	The Trial Court abused its discretion, committed an error of law, and/or there was insufficient evidentiary support for the Court's decision that the best interests of the minor child would be served by terminating Appellant's parental rights.

4.	Children and Youth acted improperly in seeking to terminate Appellant's parental rights.

5.	Counsel for Appellant reserves the right to amend this document within a reasonable time after receipt of the transcript.

The Court notes that Appellant in paragraphs (1) and (2) in his Statement of Matters Complained of on Appeal, alleges that the court erred in terminating the Father's parental rights by granting Father's voluntary relinquishment of rights and accepting his voluntary relinquishment as knowingly, voluntarily and willingly given. However, in this case, the Court issued a decree based on Title 23 Pa.C.S.A. §2511(a)(2). The Court did not terminate Father's parental rights based on voluntary relinquishment of his parental rights. The Father never voluntarily relinquished his parental rights.

3

Therefore, this Court will address the termination of Father's parental rights based on Title 23 Pa.C.S.A.§2511(a)(2) and further how the best interest of the children was considered by the Court.

## II. FINDINGS OF FACT

There are two minor children in this case. D.W. was born on August 29, 2013 and she is currently four (4) years old. N.W. was born on July 15, 2014 and she is currently three (3) years old. The children were placed on November 27, 2015. This case involves the proposed termination of Father's parental rights.

It is unrebutted that the minor children have been in placement and therefore removed from the care of Father and Mother since November 27, 2015. The reasons for placement were domestic violence, mental health issues and substance abuse issues.

In meeting its requisite burden of proof by clear and convincing evidence regarding the termination of parental rights of Father, Petitioner offered the testimony of Irene Koehler, outpatient therapist for the ReDCo Group; Alicia Singer, senior clinician at Community Counseling Services; Grace Tavaris, case manager in the Intensive Family Reunification parenting program of Family Services Association; Marisue Sack, employed by Family Service Association in the Intensive Family Reunification parenting program; Deborah Ficco, representative payee, at Fitzmaurice Community Services; and Sherri Hartman, caseworker for Children & Youth. Additionally, Father testified on his own behalf.

4

III. CONCLUSIONS OF LAW

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes:

(1) Children and Youth has shown by clear and convincing evidence that Father's parental rights to the minor children, D.W. and N.W. should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(2).

(2) Children and Youth has shown by clear and convincing evidence that terminating Father's parental rights to her minor children, D.W. and N.W. best serves the needs and welfare of the children pursuant to 23 Pa. C.S.A. Section 2511(b).

IV. DISCUSSION: GROUNDS FOR TERMINATION OF FATHER'S PARENTAL RIGHTS

The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children. A parent who cannot or will not meet the requirements within a reasonable time following the intervention by the State may properly be considered unfit and may properly have his or her rights terminated. *In Re: J.T. and R.T.*, 817 A.2d 505 (Pa. Super. 2002).

Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met.

5

*Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, *citing In the Interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

A.   23 Pa. C.S.A. Section 2511 (a)(2)

A Court may terminate parental rights under Section 2511(a)(2) when:

> The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well being and the conditions of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

Accordingly, Father's parental rights to the children, D.W. and N.W. can be terminated under Section 2511(a)(2) of the statute. Credible testimony at the termination hearing was presented and demonstrated by clear and convincing evidence that Father is incapable of presently remedying his mental health issues and incapable of providing parental care which is necessary for the physical and mental well being of the children. Father missed many visits when he was observed in a supervised setting.  Father did not progress to a point where he was observed with the children out in the public or at his home.  Furthermore, Father's failure to visit on a consistent basis was caused by Father not managing his finances so as to afford the cost of transportation, an issue which became a concern after placement.  Father chose to move to a location that would have a negative impact upon his ability to visit consistently with his children.

6

Ms. Irene Koehler, an outpatient therapist from the RedCo Group in Stroudsburg, Pennsylvania, testified as the custodian of attendance records for Father's treatment sessions with that agency. Ms. Koehler testified that Father was a client for mental health services. N.T.05/08/2017 at 8-10. She testified that Father's first appointment was scheduled for May 27, 2015 which he did not attend. Ms. Kohler testified that there were a total of thirty-eight (38) appointments which were scheduled for Father to meet with either a therapist or a psychiatrist; however, Father missed many of these appointments. *Id.* at 14, 26)

The appointments missed by Father are as follows:

    a) June 23, 2015;

    b) July 9, 2015;

    c) July 30, 2015;

    d) September 8, 2015;

    e) September 10, 2015;

    f) September 30, 2015;

    g) October 16, 2015;

    h) December 21, 2015;

    i) January 15, 2016;

    j) January 22, 2016;

    k) March 4, 2016;

    l) March 23, 2016;

    m) April 13, 2016; and

    n) April 20, 2016.

*Id.* at 14-20.

Ms. Koehler testified that Father was subsequently discharged from services on August 26, 2016. Father's diagnosis was indicated on the discharge summary as Schizoaffective disorder. *Id.* at 22. Father testified on cross examination that he was "hearing voices" three weeks prior to the date that he was testifying. N.T. 07/14/17 at 217. Ms. Koehler testified that the reason for the discharge was Father's lack of participation in treatment services. N.T. 05/08/17 at 22-23.

Ms. Deborah Ficco testified that she works for Fitzmaurice Community Services as a representative payee. She testified that as a representative payee she receives social security benefits on behalf of individuals in order to assist them in timely bill paying and money management. Ms. Ficco testified that she began working with the parents in May of 2016. She testified that when she began working with the parents, the parents were homeless. Ms. Ficco testified her agency helped the parents secure housing. Ms. Ficco testified that the parents chose to reside in Catasauqua, Lehigh County, Pennsylvania and that they would have received their social security benefits no matter where they resided. N.T. 7/13/17 at 60-62.

Ms. Ficco testified that Mother receives $1,100 per month and Father receives $777.10 per month in social security benefits. Once her agency receives the parents' social security benefits, the agency pays the parents' monthly rent, utilities, medical bills and representative payee's fee. After all expenses are paid, the parents receive their remaining "spending money". Mother and Father each receive approximately $400-$500.00 per month in "spending money."

8

Ms. Ficco testified that the parents requested that their "spending money" be deposited into their bank accounts on a weekly basis. Ms. Ficco testified that the parents' "spending money" was to be spent on basic necessities such as food, toiletries and any other household necessities. *Id.* at 64,67,75.

Ms. Ficco further testified that Father received settlement funds from the Social Security Administration in the amount of $8,210.50 to be paid in three monthly installments. Ms. Ficco testified that Father was paid $2,199.00 for each of the first two installments and received his last installment on May 2, 2017, in the amount of $3,812.50. *Id.* at 82, 96. As of the date of the hearing on July 13, 2017, Ms. Ficco testified that Father had a total of $3,700 in his account and Mother had a total of $1,069.36 in her account. *Id.* at 96-97.

Ms. Ficco testified that from the $400.00 to $500.00 that the parents were each receiving per month, she was paying them $200.00 per month for transportation. The transportation money was given to them to visit with their children. However, Ms. Ficco later learned from Ms. Hartman, case worker for Children & Youth, that the parents missed many visits during the months that they were given money for transportation. Moreover, Ms. Ficco later learned that the price of a round trip bus ticket per person was $32.75. Therefore, it would cost $65.50 for both parents for a round trip ticket and not $200.00. *Id.* at 66, 68,69, 82. Ms. Ficco confirmed on cross examination by the Guardian Ad Litem that the parents were always provided money for transportation in order to visit their children. Ms. Ficco confirmed that in September of 2016 and December of 2016 when the parents missed visits with their children, the parents had available funds to visit with their children. Furthermore, in May of 2016 and August 2016,

9

the parents would also have had sufficient funds to use for visits with their children. *Id.* at 94-95, 99-100. The Court finds that lack of funds could not have been the reason that the parents were not able to visit with their children since the funds were always available to the parents for visits.

Ms. Sherri Hartman, caseworker for Children & Youth, testified D.W. was born on August 29, 2013 and N.W. was born on July 15, 2014. The children were placed in January of 2015. Ms. Hartman testified the reasons for placement were domestic violence, mental health issues, and drug and alcohol abuse. Ms. Hartman testified that a family service plan was developed for the parents, including drug and alcohol rehabilitation services for the Father, mental health services for both Mother and Father and a requirement that the parents obtain and maintain safe and stable housing. *Id.* at 101-102.

Ms. Hartman testified that the children were initially removed from Plymouth, Luzerne County. Both parents were subsequently hospitalized to address mental health issues. Father was discharged and he moved out of Luzerne County to Tobyhanna, Monroe County, to reside with friends. When Mother was discharged, she refused a shelter placement in Wilkes-Barre, Pennsylvania and decided to move out of Luzerne County to reside with Father. Ms. Hartman testified that she later learned that the parents were evicted from the residence in Tobyhanna. In June of 2015, the parents reported that they were homeless. The parents were residing in a shelter in East Stroudsburg, Monroe County. On July 20, 2015, Ms. Hartman indicated that Mother had telephoned her and related to her that she was in a shelter and Father was residing outdoors. Mother related to Ms. Hartman that Father was moving back to Luzerne County

10

to the Wilkes-Barre area, and that she was not going to move back to Wilkes-Barre due to dislike of Father's family. *Id.* at 101-103. Ms. Hartman then indicated that the parents were homeless from August 25, 2015, until September 1, 2015 when they signed a lease in East Stroudsburg. However, in November of 2015, the parents again reported that they were homeless and resided in a shelter through March 8, 2016. By April of 2016, the parents were residing with Mother's aunt in Allentown. Ms. Hartman then learned that on July 1, 2016, the parents signed a lease in Whittier Place, Catasauqua, Lehigh County. *Id.* at 104.

Ms. Hartman testified that initially, the parenting education services were deferred due to the location of the parents' residence and the inconsistency of visitation with the children. Ms. Hartman testified that the parents engaged in mental health services initially in East Stroudsburg; however, they did not follow through with the services. The parents later engaged in mental health treatment at Community Counseling in Luzerne County. *Id.* at 104-106.

With respect to the parents' transportation for the visits with the children, Ms. Hartman testified that a bus ticket cost $32.00 per person for a round trip from East Stroudsburg to Wilkes-Barre. Ms. Hartman testified that after the parents purchased their tickets, they would submit the receipt to Children & Youth and the parents would be reimbursed for the cost. Ms. Hartman stated that once the parents moved to Catasauqua, a farther location than East Stroudsburg, then the price doubled for the bus pass which then would have been approximately $64.00 per person. Ms. Hartman testified that she related to the parents that they could only be reimbursed for one bus pass due to the expense of the bus pass. Ms. Hartman testified that initially the visits with the children were

11

weekly, but when the parents were not able to make the weekly visits, the visits were then bi-weekly. *Id.* at 106-107.

Ms. Hartman emphasized that she had recommended several times to the parents to move back to Luzerne County. She further explained to the parents that they did not need to return to Plymouth, where a relative with whom they had a disagreement was residing. The parents could move anywhere in Luzerne County. However, the parents refused. *Id.* at 107.

Ms. Hartman testified that from April 2015 through June of 2015, the parents' visits with the children were inconsistent. She testified that Father was residing in Tobyhanna and did not have transportation for the visits. Ms. Hartman testified that in July 2015, the parents were provided assistance with transportation. However, the parents attended only one visit out of four visits in July. In August of 2015, they again attended one visit out of four visits. In September, they attended all scheduled visits. In October and November, they attended one visit in each month. In December of 2015, they attended four out of five visits.

Ms. Hartman stated that the parents moved to Lehigh County in April of 2016. Ms. Hartman testified that initially the parents had family members and a friend transport them prior to the use of bus transportation. *Id.* at 108-109. Ms. Hartman testified that according to information she received, the parents only had two problems with the bus transportation. The first issue was when Mother took the wrong bus and ended up at a different location. The second issue was when the bus experienced mechanical problems. Ms. Harman testified that the parents moved to Lehigh County in April of 2016. She testified that in May of

12

2016, the parents attended one visit and cancelled three visits. In June 2015, the parents attended two visits and cancelled two visits. In July of 2016, they attended one visit and cancelled three visits. Ms. Hartman testified that there were some months where they did not visit with the children at all. *Id.* at 110-111.

In addressing Father's mental health issue, Ms. Hartman testified that Father was discharged from Community Counseling due to non-compliance. Ms. Hartman explained that Father was engaging in services in the Allentown area, but only recently he began working with the mental health component. At the time of the hearing on July 13, 2017, Father was still engaged in the program.

Ms. Hartman further testified that approximately one month prior to the July 13, 2017 hearing, Father related to her that he began hearing voices again and he was going to participate in a partial program in addition to adjusting his medication. Ms. Hartman indicated that Father has been diagnosed with the mental illness of schizophrenia.

Ms. Hartman testified that she was concerned that Father had not stabilized his mental health. Furthermore, Father has been inconsistent with his treatment. Ms. Hartman stated that Father was not able to engage in a mental health program until he successfully completed the drug and alcohol. Father had trouble completing the drug and alcohol program. Therefore, Ms. Hartman was concerned regarding Father's inability to maintain stability. *Id.* at 111-113.

According to Ms. Hartman, the remaining concerns address protective capacities and the ability to prioritize needs. For instance, Ms. Hartman testified it took Mother and Father one year to purchase a bed for either child.

13

Furthermore, the parents did not provide the children with proper nutrition. Ms. Hartman testified that the parents would bring snacks such as "Buffalo chips", hot chips that little children should not be eating at that age. Ms. Hartman indicated that she did not believe that the parents understood age appropriate development for the children. *Id.* at 114. Ms. Hartman ultimately stated that she does not believe that the Father remedied the circumstances that led to the children's placement. *Id.* at 113.

Furthermore, Ms. Hartman testified that the children initially had a bond with the parents. However, due to the parents' lack of visitation, that bond has deteriorated. According to Ms. Hartman, it is difficult to maintain a bond when the parents are visiting the children once per month. Ms. Hartman testified that she observed the children with the natural parents and she also observed the children with the foster parents. The children spontaneously began calling the foster mother, "Mommy." *Id.* at 136-137.

Ms. Alicia Singer testified that she is a senior clinician employed at Community Counseling Services. She testified that she is familiar with the case only as the record custodian. Ms. Singer testified that Father was receiving mental health services at the agency. Ms. Singer testified that Father came to the agency on June 7, 2016 for an intake. After the intake, he missed three (3) appointments with the therapist, canceled two (2) appointments, and attended three (3) appointments. Furthermore, Father failed to complete his psychological evaluation. Therefore, Father did not complete the services offered to him. 05/08/17 at 45-47. Furthermore, Ms. Singer testified on cross examination by

14

Father's counsel that Father did not make any attempt to reengage in the services. *Id.* at 57.

Ms. Grace Tavaris testified that she is employed at Family Services Association. She testified that she worked with Mother and Father as a case manager and also in the Intensive Family Reunification Services parenting education program(IFRS). Ms. Tavaris testified that she began working with the parents in June of 2015. Ms. Tavaris described the IFRS as a parenting program designed to work with the causes for placement so that the children can either return home to their parents or have permanency. Ms. Tavaris indicated that the concerns noted in the file by the case worker were mental health issues for both parents, drug and alcohol issues for Natural Father, domestic violence concerns for Mother and the need for safe and stable housing for both. N.T. 7/13/2017 at 7-9.

Ms. Tavaris testified that the parents were experiencing transportation issues; therefore, they only met with the parents for the introductory meeting. Ms. Tavaris testified that she attempted to meet with the parents on July 1, 2015, July 15, 2015, July 28, 2015, and August 4, 2015, but was unable to meet with them. Since the parents were not able to consistently meet with Ms. Tavaris, the case was deferred until the parents were able to visit consistently. The program is meant to include meetings with the parents twice per week. Ms. Tavaris testified that without being able to meet on that basis, it is difficult to gauge the parents' progress. *Id.* at 9-10. Therefore, according to Ms. Tavaris, the case was "on hold". *Id.* at 12.

15

Ms. Tavaris testified that the parents were referred to the same program with the same concerns on February 25, 2016. Ms. Tavaris testified that the parents remained inconsistent with their attendance. Ms. Tavaris testified that she was supposed to meet with the parents twice per week, however, the parents were only able to meet once per week and later were available once every two weeks. *Id.* at 13. Ms. Tavaris testified that the parents did complete the IFRS program; however, they completed the program with "concerns". *Id.* at 26-27.

Ms. Marisue Sack, also employed by Family Services Association in the Intensive Family Reunification Program (IFRS) explained that the parents completed the program with "concerns". Ms. Sack testified that she began working with the family in March of 2016 and there were 26 sessions offered to the family, however the parents only attended 10 sessions. Ms. Sack indicated that she was informed that the reason the parents only attended 10 out of 26 sessions was due to transportation issues and an inability to obtain money from the representative payee for transportation. Ms. Sack stated that the program was "completed with concerns" due to the following reasons:

a) The inconsistencies in the keeping the parenting sessions;

b) The inconsistencies in visiting with children at the child welfare agency;

c) The visits were only observed at the child welfare agency. Ms. Sack was not able to see the children with the parents in their own home or in a public setting. She was observing the parents in a supervised setting. *Id.* at 31-32.

Ms. Sack testified that it was important for the parents to attend all the sessions on a consistent basis. The goal of the program is to work with parents

16

and children toward reunification. The lack of consistency from parents hindered that reunification. *Id.* at 34. Ms. Sack testified that she was supposed to meet the parents and observe the visits two times per week. Ms. Sack was only able to meet with the parents ten times over a period of nine months. *Id.* at 34-35. Ms. Sack testified that she also attempted to work with the parents by recommending that they move back to Luzerne County so that they would be closer to the agency for visits. However, the parents, who were residing out of county, did not wish to move back to Luzerne County. Ms. Sack stated that the parents had an issue with one of the relatives, an aunt who lives in Luzerne County, and did not want to reside in the vicinity of the aunt. *Id.* at 35-36. Ms. Sack further testified that they worked with the parents regarding their financial budget. They explained to them that their spending should be used for necessities such as purchasing a "potty chair" while they are potty training one of the girls. Most importantly, Ms. Sack testified that they emphasized to the parents that they had to insure they have a sufficient amount of money for transportation in order to visit with the children. *Id.* at 36-37.

Ms. Sack testified that during the program, Mother and Father did maintain housing and were no longer homeless. Ms. Sack also testified that with respect to domestic violence, Mother and Father made progress and worked with their communication skills, learning to walk away during an argument and working with stress. However, Ms. Sack remained concerned regarding parenting abilities. Ms. Sack testified that her observations of the parents were solely under a supervised setting. She was not able to observe the parents in an unsupervised setting. Ms. Sack became concerned regarding the parents'

17

budgeting. Although budgeting may not have been an initial reason for placement, budgeting later became an issue which affected the parents' ability to visit with the children.

Ms. Sack also testified that initially the parents were scheduled for a visit once per week. Then it was once every two weeks at the parents' request. However, should the parents cancel a visit, the next visit would not occur until two weeks later. *Id.* at 39-41. The inconsistency created a scenario in which the parents saw the children only once per month. Therefore, Ms. Sack testified that although the parents completed the program, the program was completed with "concerns". *Id.* at 45. Ms. Sack confirmed, on cross examination by the Guardian Ad Litem, that the parents did not see the children sufficient times for her to assess the type of bond they have with the children. *Id.* at 51. Ms. Sack further explained that although the parents were able to apply the information they learned in 10 sessions over a nine (9) month period, that time frame was not sufficient for Ms. Sack to recommend that the children return home as all the visits were in a controlled and supervised environment. *Id.* at 53.

Ms. Sack further testified that the parents had chosen to reside outside of Luzerne County. The parents receive their income from social security benefits and thus, would have received the money even if they resided in Luzerne County. Ms. Sack noted that had the parents chosen to reside in Luzerne County, they would have been able to see their children more often. *Id.* at 55-56.

The Court finds that Father had opportunities to reside in Luzerne County close to his children. Father testified that he did not wish to remain in Luzerne County because he did not want to surround himself with people who are using

18

drugs, in order to help with his sobriety. N.T. 07/14/18 at 2017. However, the court finds that Father could have certainly resided in Luzerne County in a different town and away from "the people who are using drugs"; however, Father refused. The court finds that when given the choice to have visits with the children, Father chose his own interest above the children's interest. By remaining in Luzerne County away from "the people who use drugs" and visiting with his children on a consistent basis, Father would not have had to choose between his own interest and the children's interest. He could have served both interests. The court further finds that Father's mental health issue contributed to his failure to appreciate the consequences of not visiting with his children on a consistent basis. Father's choice to reside in a different county and thus, create a more difficult situation for himself, in addition to Father not insuring that he had sufficient funds to visit his children also reflects Father's impaired judgment.

Based on the Petitioner's evidence, the Court finds that Father is incapable of providing the children with essential parental care, control or subsistence necessary for the children's physical or mental well being and further finds that Father's mental health issues and thus his attendant parental choices have not been remedied. Therefore, based on the all testimony of the witnesses, the Court further finds that Father has not been able to remedy all of the conditions that gave rise to the placement of the children, namely his mental health concerns.

Unlike 23 Pa.C.S.A. § 2511(a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in

19

subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and . . . this is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." (our emphasis added) *In re E.A.P.*, 944 A.2d 79 (Pa. Super 2008).

At this juncture, the children's right to have proper parenting in fulfillment of their potential in a permanent, healthy, safe environment outweighs Father's interest.. *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, *citing In the Interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

## V. ADDITIONAL CONSIDERATIONS UNDER 23 P.A.C.S.A. SECTION 2511(b)

### FOR FATHER

### A. ENVIORNMENTAL FACTORS

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

As "environmental factors beyond the control of Father" was not the linchpin in the placement of the minor children and because of the presence of other, independent factors utilized in the placement of D.W. and N.W., this consideration does not apply and will not be addressed.

### B. NEEDS AND WELFARE OF THE CHILDREN

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This is to

20

be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again. *In re Matsock*, 611 A.2d 738 (1992).

The term "needs and welfare" of a child refers to both tangible and intangible needs. The intangible needs of a child include love, comfort, security and closeness. *In re Matsock*, 416 Pa. Super. 520, 611 A.2d 737, 747 (1992). There is nothing in the record that shows that the natural Father is presently capable of providing a safe, secure environment for the minor children.

Parental duty is best understood in relation to the needs of a child. These needs, both physical and emotional, cannot be met by a mere passive interest in the development of the child. Meeting a child's needs is a positive duty that requires affirmative performance. *In re Shives*, 363 Pa. Super. 225, 525 A.2d 801, 802 (1987).

A parent is not relieved of his or her responsibility relating to the needs of a child when a child has been placed in foster care. A non-custodial parent has a duty to exert himself to take and maintain a place of importance in the child's life. *In re Adoption of M.J.H.*, 348 Pa. Super. 65, 501 A.2d 648 (1985). A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975). Moreover, a parent with a child in foster care has an affirmative duty to work toward the return of the child. *In Re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978).

When considering the needs and welfare of the child, it is also important for the court to consider the bond between the parent and the child because

21

severance of a strong parental bond can have a detrimental impact on the child. *Matsock, supra.*

Petitioner presented credible testimony regarding the needs, welfare and best interest of minors D.W. and N.W. in relation to their Father. Ms. Hartman, testified that the children have been with the foster parent, Sharon Anderson, since September 21, 2015. N.T. 07/26/17 at 7-8. Ms. Hartman testified that she observes the children on a monthly basis.

Ms. Hartman testified that the children have been assimilated into the family. They attend all family outings and refer to family members as uncles, aunts and grandparents. Ms. Hartman also testified that the foster parent is an adoptive resource for the children.

Ms. Hartman testified that the foster mother meets the children's physical needs. She provides the children with food, shelter, and clothing. The children's medical needs and immunizations are also up to date. *Id.* at 9.

Ms. Hartman further testified that the foster mother meets the children's developmental needs. She works with the children on age-appropriate activities. She is teaching D.W. her numbers and alphabet. She engages the children in play dates so they are interacting with other children. The foster mother also "potty-trained" the children.

Ms. Hartman testified that the foster mother also meets the children's emotional needs. According to Ms. Hartman, the children seek the foster mother for comfort and affection. The foster mother is very nurturing with the children and very affectionate toward them. Ms. Hartman testified that the children have been with the foster parents since the date of placement. *Id.* at 8, 21.

22

Ms. Hartman also testified that there is a bond between Father and the minor children. Ms. Hartman describes the children's bond with their Father as a "play date bond." She testified that usually the Father shows affection to the children rather than the children showing him the affection. Ms. Hartman did testify that usually D.W. is more affectionate toward her Father than her Mother. Ms. Hartman testified that N.W. just follows her sister, D.W. N.W. does, however, struggle with recognizing that she is visiting with her father.

According to Ms. Hartman, D.W. exhibits some behavioral issues when she has to visit the natural parents. After the visits, she easily separates from them to return to the foster mother. *Id.* at 11-12. Ms. Hartman testified that when there was a period of time when the visits did not take place between the natural parents and the children, the children did not inquire about the visits. D.W. also was having less behavioral issues.

Ms. Hartman described the bond between the foster mother and the children as a parent/child bond. She also described the bond as a positive bond. Both children call the foster mother "Mommy" and also follow the rules she puts in place. *Id.* at 12-13.

Ms. Hartman testified that the foster parent is willing to be legally and financially responsible for the children. The foster mother is aware that the children can inherit from her as if she is their own natural mother. *Id.* at 32. Ms. Hartman also believes that if the natural parents' rights are terminated, it would have a positive effect on the children. The children would have stability and would be adopted into a loving and caring family. Ms. Hartman further stated that the children would not be negatively affected should the contact with the

23

natural parents be terminated. She explained that there was a lack of consistency. At times, the parents only saw the children once per month. Other times, the children did not see the parents at all in a given month. The visits were not consistent. Ms. Hartman believes that adoption of the children by the foster mother serves the best interest of the children. *Id.* at 12-13.

Accordingly, based on the testimony of Ms. Hartman, the court further finds that the termination of Father's parental rights would best serve the needs and welfare of the children.

## VI. ADOPTION AND SAFE FAMILIES ACT (ASFA) CONSIDERATIONS

The Pennsylvania Superior Court relied upon the Adoption and Safe Families Act (ASFA) in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010). The goal of ASFA was described as follows:

> Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*Id.* at 1119-1120 citing *In re G.P.*, 851 A.2d 967, 975-976 (Pa. Super. 2004)

The Court also provided that "above all else . . . adequate consideration must be given to the needs and welfare of the child . . . A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *Id.* at 1121 (internal citations omitted).

In reversing the trial court and terminating the natural parent's parental rights, the Superior Court held:

24

"ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification."

*Id.* at 1125-26.

These ASFA-related policies are applicable in the present case of minor children D.W. and D.W. These children have been in placement since November 27, 2015, over a period of two (2) years. Accordingly, the time frame of 18 months has long expired within which to remedy parental incapacity and there is little rational prospect of the timely reunification of D.W. and N.W. to their Father.

## VII. CONCLUSION

The Court finds that Father has not addressed nor remedied his mental health issues and thus, his attendant parenting deficits so that he is capable of providing essential care and control of the minor children. The Court further finds that Father is not able to meet his children's needs. In stark contrast, the foster mother has amply demonstrated she can and does meet the physical, developmental and emotional needs of the minor children. N.W. and D.W. have thrived under her care. The children need and deserve a permanent home with a loving capable parent. The only way to provide this is to terminate the rights of the Father.

Clearly, it is in the children's best interest to do so.


Respectfully submitted,

BY THE COURT,

_____
JENNIFER L. ROGERS                    J.

DATE: _July 23, 2018_


COPIES TO:


Jena Piazza Braunsberg, Esquire
Children & Youth Services
of Luzerne County
111 North Pennsylvania Boulevard
Wilkes-Barre, PA 18701

Thomas Sharkey, Esquire
Attorney for Appellant
982 North Sherman Court
Hazleton, PA 18201

Paul L. Delaney, Esquire
Guardian Ad Litem
16 Institute Street
Wyoming, PA 18644